Antoinette HARRISON,

v.

SEA RIVER MARITIME, INC.

Civ. A. No. G-01-247.

United States District Court,
S.D. Texas,
Galveston Division.

Jan. 23, 2002.

Francis I. Spagnoletti, Spagnoletti & Assoc, Houston, TX, for Antoinette Harrison, plaintiff.

Thomas R. Nork, Bell Ryniker et al, Houston, TX, for Seariver Maritime Inc, defendant.

### *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

KENT, District Judge.

This cause came on for a non-jury trial on November 14, 2001, Honorable Samuel B. Kent presiding. The Court carefully considered all trial testimony and exhibits. The Court has further carefully considered the Pre–Trial Order, together with all relevant attachments, all pleadings on file herein, all post-trial submissions, particularly including proposed findings of fact and conclusions of law from both sides, and the trial briefs of both parties. The Court has carefully considered the transcript of proceedings filed post-trial, together with all of the deposition submissions of each party. The Court has carefully considered applicable statutory and case law, particularly that of the United States Court of Appeals for the Fifth Circuit. On the basis of its own careful observations during trial, the making of credibility assessments of all witnesses appearing live at trial, or by deposition, and the detailed consideration of all of the above materials, pursuant to FED. R. CIV. P. 52, the Court now enters its Findings of Fact and Conclusions of Law.

### I.

### *INTRODUCTION*

This cause was originally filed on April 30, 2001. Plaintiff herein alleges maritime personal injuries and asserts admiralty claims pursuant to FED. R. CIV. P. 9(h). Plaintiff asserts a negligence claim pursuant to the Jones Act, 46 U.S.C.App. § 688, and a claim for unseaworthiness, pursuant to the General Maritime Law of the United States. Jurisdiction is proper in this Court, pursuant to 28 U.S.C. § 1333 and FED. R. CIV. P. 9(h). Venue is properly before this Court, and uncontested. On June 5, 2001, a Rule 16 scheduling conference was held, at which time this matter was set for trial on November 19, 2001. On November 6, 2001, a docket call was held before the Court, at which counsel of record for both sides announced ready. Through the kind accommodation of both counsel, the Court agreed to a slight acceleration of trial of this matter, and set the matter "number one" on the Court's trial docket for November 14, 2001. On that date, counsel for both sides appeared and announced ready and trial proceeded to conclusion. At the end of trial, the Court established, with the consent of counsel, a firm schedule for the submission of all relevant post-trial materials. After the granting of certain extensions to accommodate counsel, all such submissions are now properly before the Court, and this case is now ripe for the Court's final consideration.

## II.

### *FINDINGS OF FACT*

1. Plaintiff ANTOINETTE HARRISON ("Harrison") was born on September 2, 1960, in Lake Charles, Louisiana. She was raised in Beaumont, Texas. At the time of trial, she was slightly more than forty-one (41) years of age. She began working part-time at the age of sixteen (16) and graduated timely from Hebert High School, in Beaumont, Texas. While in high school, she was active in school sponsored athletics, being on the volleyball, basketball and track teams. She has had no college or further academic education. Thereafter, Harrison worked a number of different jobs, including custodial, landscaping and construction work, the latter particularly including work as a welder, a bricklayer's helper, a power plant operator, a refinery operator and, finally, as a car detailer. Such work has regularly involved a moderate to extensive labor and physical activities and Harrison testified that she has been a hard worker throughout her life.

2. Harrison began shipping in the American Merchant Marine in 1994. Her initial work was with Sabine Transportation, for a period of roughly four years. During that time, she worked in the Mess Department as both a Cook and Steward. She was required to undertake and successfully pass a pre-employment physical before commencing work with Sabine Transportation. During her work with that company, she was required to move up and down stairs frequently while carrying loads, to assist in feeding the vessel's crew and to keep the various ships to which she was assigned in good order.

3. While working for Sabine Transportation, Harrison injured her right knee while carrying a crate up some stairs. While she was ascending the stairs, she felt a pop and twitch in her right knee. She did not suffer a misstep, blow to, or twist of her knee. She was off approximately eight weeks. She underwent a successful convalescence from that injury and filed no litigation or other sorts of claims. She was thereafter promoted, and continued to serve several more months in work she testified she enjoyed immensely. She worked hard and was well thought of by Sabine Transportation.

4. During the summer of 1998, Harrison applied to Defendant SEA RIVER MARITIME, INC. ("Sea River") for employment, primarily to obtain better pay and benefits. She underwent a pre-employment physical, which she successfully passed, in order to commence such employment. She began in an entry-level position of Maintenance Seaman, working in the Deck Department. She remained in this position for a total of about four (4) months. After completing a two-week training course, Harrison was initially assigned to the S/R North Slope, an oil tanker owned and operated by Defendant. During her two-week training course, Harrison was given safety materials and training, to explain Sea River safety policies and expectations.

5. Harrison joined the S/R North Slope in May 1999, in Benicia, California. At that time, the S/R North Slope was traveling to a Portland, Oregon shipyard for a steel survey and inspection. The vessel had to undergo cleaning prior to her arrival in Portland and Harrison was one of two maintenance seapersons working aboard the vessel in such preparations. The other was Seaman Donald Picou ("Picou"). Prior to commencement of her service aboard the S/R North Slope, Harrison had been certified by the United States Coast Guard as a Maintenance Seaman. This is essentially analogous to the old rating of Ordinary Seaman, and is an entry-level position

in the Deck Department. When she joined the vessel, it was well known to her supervisors that she was a new seaperson and unfamiliar with the work of the vessel, save and except her brief two-week training session. Harrison reported to the Chief Mate aboard the vessel, Richard Rauhut ("Rauhut"), for daily work assignments. At 0800 each day, Harrison and Picou would confer with Rauhut for their work assignments. Rauhut had long experience in the Merchant Marine, having sailed with Exxon Shipping Company since June, 1991. He had been promoted to the position of Chief Officer in 1997. Picou had been working for Sea River for several years, and was considerably more experienced in Deck Department work than was Harrison. As such, he was the senior person on each of the jobs they undertook and she had to look to him for guidance, instruction and primary safety awareness.

6. On or about the morning of June 18, 1998, Harrison reported to Rauhut in the cargo control room for her daily job assignment. During the several days prior to working on the deck, Harrison was assigned to cover the vessel's floors with plastic. She used knee pads for laying plastic, but both of her knees felt sore as a result of the arduous work. However, she was not in anyway disabled from her normal work or watches. On June 18, 1998, Harrison was informed, along with Picou, that there were discharge hoses and blowers on the deck that needed to be cleared from the deck before the vessel went into the shipyard. At that time, the S/R North Slope was traveling in the Columbia River towards the shipyard. The discharge hoses had to be carried forward to the fo'c'sle to be rinsed with fresh water, in preparation for storage. Harrison and Picou were instructed to take the discharge hoses to the freshwater connections at the fo'c'sle head. The S/R North Slope's discharge hoses used in tank-cleaning operations

were a light weight rubber, or polypropylene, although the dimensions appear to be in dispute. Defendant contends that the hoses were roughly 3 inches in diameter and varied in length from 50–75 feet. Plaintiff contends that the hoses were more in the 75–100 foot range, and were as much as 6–8 inches in diameter. Defendant contends that the hoses were relatively light, in the range of 20–30 pounds apiece, but Plaintiff contends that they were much heavier.

7. Of critical importance, Harrison affirmatively testified that there was no safety meeting on the morning in question. Rauhut and Picou concede this as well. She received her instructions to simply remove hoses forward but was not told how to do it, or for that matter, how not to do it. She testified that she did not ask for more specific instructions because everyone on the vessel knew she was brand new to the Deck Department and moreover, she was working with a much more experienced person. She assumed that if the Chief Officer did not give her specific instructions, Picou would.

8. Pursuant to these global instructions from the Chief Officer, Picou and Harrison proceeded to the deck and commenced taking the hoses forward. In order to do so, each hose was brought to a stairwell for transportation down a deck and then forward. Harrison would take the front of each hose and proceed down the steps, holding the rail with one hand, and carrying the hose over her shoulder. Picou stayed above, initially out of sight of Plaintiff, because of the length of each hose, and moved the line forward. He would push the hose forward and as more and more of the hose went down the stairs, she asserted and Picou conceded that more and more of it was carried on Plaintiff's shoulder. Several hoses (apparently up to eight) were carried in this fashion without inci-

dent. However, while carrying one of the hoses, Plaintiff was descending the stairs, as the Court has described. She felt a pop in her left knee. She had never had any prior problems with that knee. She kept working that day for an additional five or six hours. However, the knee hurt throughout the day and began swelling.

9. Defendant submitted a video, during the course of trial, of the work area in question aboard the S/R North Slope. The video shows a very attractive, modern vessel, which appears to be well equipped and maintained. Plaintiff readily concedes that the lighting on the ladder was completely adequate, that the stairs were properly built and maintained, that there were available hand rails and non-skid surfaces, and that the vessel was in calm waters and the ladder was stable. She makes some complaint that the ladder was fairly steep, but concedes that she had gone up and down the ladder numerous times without difficulty. The hoses displayed on the video appear to be about 4–5 inches in diameter to the Court. Plaintiff testified that the weight of the portion of hose on her shoulder initially, when she began carrying the hose down the ladder, was not more than 15–20 pounds. However, she testified that when Picou pushed on the rear of the hose, the weight "piled up". It is of critical importance to the Court that Picou testified that as work progressed he saw Plaintiff had too much weight and offered to switch places with her. However, by this time it was too late, as Plaintiff had already injured her knee.

10. In the Pre–Trial Order, Defendant states, rather astonishingly, "Plaintiff's damages, if any, arise out of risks and hazards which routinely confront women who choose to work upon the seas." The Court is deeply troubled by that comment, because it would seem to indicate that if women choose to work aboard Defendant's vessels, they somehow assume some unspecified peril unique to their gender. This concern is borne out because Defendant hotly contests any liability in this case whatsoever, but the following factors are overwhelmingly clear from the Record. First, the Chief Officer testifies, by deposition, that the job should definitely not have been done the way it was. The hoses should have been lowered from one deck to the next, but under no circumstances should they have been carried down the stairs. Unfortunately, he never bothered to tell Plaintiff, whom he knew was a brand new seaperson, about this seeming prohibition of the very way in which she was doing her job. Second, Picou further testified, by deposition, that the job should not have been done the way it was, but he was the senior seaperson on hand, and indeed it was pursuant to his instructions that the Plaintiff was doing the work precisely as she was doing it when she was hurt! Third, Defendant's own Safety Manual states unequivocally that a Job Hazard Assessment, especially for new personnel, should have been done. Nevertheless, both the Chief Officer and Picou concede that no such Job Hazard Assessment was done whatsoever.

Fourth, Defendant's own liability expert, Captain David Marsh, testified at trial that in making his determination as to the lack of Defendant's responsibility for Plaintiff's injury, he was *never* provided the depositions of either the Chief Officer or Picou, to the effect stated above. Indeed, when confronted at trial with the testimony of the Chief Officer, who said that the way Plaintiff was doing her job was flatly unacceptable, and that the hoses should have been lowered down the stairs, rather than carried, he conceded that the job was improperly instructed and conducted. He conceded that a Job Hazard Analysis would have avoided any lapse in communication and that it would have only taken a

few minutes to specifically and unequivocally instruct the Plaintiff in how to do or how not to do this job.

In fact, based upon the testimony of Captain Marsh, together with the deposition testimony of the Chief Officer and Seaperson Picou, it is abundantly clear to the Court that the hoses should have been fed down the ladder, and not carried down. Picou should have told the Plaintiff not to carry the hoses at all, and otherwise instructed her in the minutia of this job. The Chief Officer, knowing that Plaintiff was new to the job, should have either taken pains to explain the details of the job himself, or made sure that Picou did so properly. The failure to do each and all of these things constitutes clear negligence. The Court is further troubled that in assailing Plaintiff's version of the facts, Defendant attempted to confront Plaintiff with her own (rather nebulous) statement during the course of trial. However, upon objection from Plaintiff's counsel, it was learned that Defendant had willfully withheld this document throughout discovery, and indeed had even denied its existence in response to Interrogatories. Only at the eleventh hour, during cross examination of Plaintiff on the stand, was this document produced. The Court, taking all of these factors into consideration, firmly believes that this is a case of clear and unequivocal negligence.

■ 11. The Court finds Defendant negligent in failing to instruct a new seaperson in the details of her work, in allowing her work to proceed in a hazardous fashion under the direct supervision of a seaperson who knew better and yet failed to take any steps whatsoever to correct the manner in which Plaintiff was undertaking her work, the failure of the Chief Officer to properly instruct the senior seaperson in attendance to ensure proper safety on the job, and the failure of both the Chief Engineer and Picou to undertake a Job Hazard Assessment to ensure that this new seaperson would not be exposed to undue risks. However, the Court further finds Plaintiff ten percent (10%) negligent for her own injury, in failing to ask more questions about the job, and in failing to be certain that she was going about it in both the proper way and the most safe way possible. On that basis, the Court assesses ninety percent (90%) negligence to Defendant and ten percent (10%) negligence to Plaintiff.

■ 12. The Court finds that the stairs were adequate in the circumstances and that no other items or pertinences aboard the vessel caused or contributed to causing Plaintiff's injuries. Consequently, the Court finds that Plaintiff has failed in her burden to establish an unseaworthy condition aboard the vessel, by a preponderance of the evidence. In consequence, Plaintiff's claims predicated upon unseaworthiness are **DISMISSED WITH PREJUDICE.**

13. The Court finds that Defendant has not unreasonably withheld maintenance or cure in the past and that any such past or future claim is subsumed by Plaintiff's offer of uncontroverted past losses, and her future damages. Thus, the Court declines to award any further maintenance or cure, beyond the medical losses assessed *infra.*

14. After her injury on or about June 18, 1998, Harrison remained aboard the vessel for another two weeks. She worked normal hours and shifts. However, she had a lot of pain and swelling in her knee. Subsequently, Plaintiff transferred to the M/V Sea River Galveston. She worked aboard that vessel for roughly sixty (60) days. During that time, while suffering on-going symptoms and receiving on-going medical care, she finally reported to the Captain of the M/V Sea River Galveston that she had injured herself on her prior

vessel. This was the first official notice she had given to the Defendant of her injury. Defendant makes much of this, but the Court finds completely credible and believes Plaintiff's testimony that she had led an arduous life, was used to working with some degree of overall pain, and that she loved her job and wanted to keep it and didn't want to create problems for herself. The Court finds nothing remarkable about the fact that she delayed reporting the injury, hoping that it would clear up on its own.

15. Plaintiff had a history of knee soreness. She apparently has misaligned knees which create problems as she is 5' 2" and has carried weight up to a maximum of about 180 pounds. The Court notes that her trial appearance indicated a well nourished black female who appears to have extraordinary musculature. Indeed, she testified that she weighed about 150 pounds at trial, but weighed 30 more pounds when she was injured. She testified that most of this weight was muscle, and the Court finds this testimony credible and believes her. Moreover, the Court notes that she successfully passed two pre-employment physicals in her maritime career and that if her knees were sore and ached from time to time, this is no different than many working people who do hard work for a living. From all indications, she liked her work a great deal, and did it very well, and the Court finds credible and believes her left knee pain resulted from her stated injury and *not* from any preexisting condition.

16. After reporting her injury, she saw a Dr. Hayes in Beaumont, who prescribed analgesic medications and physical therapy. These were not substantially helpful, and she subsequently had arthroscopic surgery on her left knee. She underwent further physical therapy and work hardening. Importantly, Plaintiff filed no litigation during this time, as she was trying to return to work. The knee collapsed during the second round of work hardening, and Dr. Hayes ultimately referred Harrison to an orthopaedic specialist, a Dr. Smith, at the University of Texas Medical Branch, in Galveston. Plaintiff subsequently underwent a second surgery, involving a massive open reduction of the left knee. The extent of the surgical repair is indicated in the photographs Plaintiff offered at trial. Since that time, she has undergone considerable physical therapy and additional medical treatment. She is presently seeing a Dr. Cupic, who has opined the possibility of still further surgery, although this is by no means a medical probability.

17. Harrison's most recent surgery was in the Spring of 2000. Since that time, she has remained off duty and is attempting to convalesce. Her doctors equivocate as to whether or not she can go back to the work in the future, but all are in agreement that she will never return to sea. The Court finds that Plaintiff can undoubtedly do different types of work. She has demonstrated a lifetime of hard work and diligence, and the Court has no doubt that she will so apply herself similarly in the future, despite a limited formal education. However, the Court specifically finds, based on overwhelming medical testimony, and its own practical experience in presiding over literally hundreds of similar sorts of cases, that it is highly unlikely that the Plaintiff will ever return to work in the Merchant Marine.

Income tax returns offered at trial indicate an average three (3) year earnings history, in the years prior to Plaintiff's injury in 1998, of roughly Thirty-nine Thousand and 00/100 Dollars ($39,000.00) per year. According to Dr. Kenneth McCoin, Plaintiff's expert economist, who was unrebutted at trial, Plaintiff has a

work life expectancy of 17.4 years. The Court finds that out of a gross income of Thirty-nine Thousand and 00/100 Dollars ($39,000.00) per year, and based upon her tax returns, her net income was approximately Thirty Thousand and 00/100 Dollars ($30,000.00) per year. Against this, the Court finds that the Plaintiff can earn at least Eight and 00/100 Dollars ($8.00) per hour, once she has recovered, which would yield an annualized, residual earnings potential of Sixteen Thousand and 00/100 Dollars ($16,000.00). Reducing this amount by likely taxes and other appropriate deductions, the Court finds that Plaintiff has a residual, net earning capacity of roughly Fourteen Thousand and 00/100 Dollars ($14,000.00) per year. Deducting this amount from her annualized theoretical loss, Plaintiff has demonstrated a yearly annual wage loss, through her work life expectancy, of Sixteen Thousand 00/100 Dollars ($16,000.00) per year. This amount multiplied by 17.4 years equals a future wage loss of Two Hundred Seventy-eight Thousand Four Hundred and 00/100 Dollars ($278,400.00). Dr. McCoin also testified that Plaintiff will experience a loss of fringe benefits which would not be available in more modest employment. The Court finds this amount, based upon his uncontroverted testimony, at fifteen percent (15%) per year, or a total, over the next 17.4 years, of Forty-one Thousand Seven Hundred Sixty and 00/100 Dollars ($41,760.00).

Dr. McCoin also opined a substantial amount for loss of household services, but no substantiating testimony was offered either by Plaintiff or otherwise, and the Court does not find any such losses. On the basis of these calculations, the Court finds that Plaintiff has sustained past losses, from date of injury through date of this Judgment, equaling One Hundred Twenty-three Thousand Six Hundred Twenty-five and 00/100 Dollars ($123,625.00). However-er, from this amount must be deducted two months worth of post-accident wages that Plaintiff earned aboard the M/V Sea River Galveston, together with the one full year of benefits voluntarily provided by Defendant, which constitute a credit or an offset against Plaintiff's stated losses. The net past loss for Plaintiff, therefore, between June 18, 1998 and today's date, equals Seventy-three Thousand Twenty-five and 00/100 Dollars ($73,025.00).

18. The Court finds that Plaintiff has incurred uncontested past medical expenses which have not been reimbursed, of Three Thousand Fifty-seven and 00/100 Dollars ($3,057.00). The Court finds that based upon the uncontroverted testimony of Dr. Cupic, Plaintiff will experience roughly One Thousand Five Hundred and 00/100 Dollars ($1,500.00) in analgesic medical care throughout the remainder of her life. Based upon the uncontroverted testimony of Dr. McCoin, the Court finds that Plaintiff has a life expectancy of 33 years. Thirty-three (33) years multiplied by $1,500.00 per year equals a total of Forty-nine Thousand Five Hundred and 00/100 Dollars ($49,500.00). The Court finds this amount reasonable compensation for reasonably medically probable future medical expenses. The Court notes the testimony of Dr. Cupic that Plaintiff *might* have to have further surgery on her left knee in the future, but at this juncture, such is only speculative. Therefore, the Court respectfully declines to award any amount for this speculative loss, as it is not reasonably medically probable.

19. The Court finds that Plaintiff has undergone two surgical procedures, extensive and intensive physical therapy and analgesic care, and a substantial medication regimen. She has willingly undergone extensive work hardening programs, and has diligently tried to get back to work. The Court finds that she is signifi-

cantly disabled, that she has injuries which will last her lifetime, and that she has experienced substantial subjective losses, including loss of physical abilities, loss of the enjoyment of life, pain and suffering in the past and in the future, as well as significant disfigurement. The Court finds that all of these losses, both subjective and objective, are the direct and proximate result of the negligence of both Defendant and Plaintiff, based upon the above liability apportionment. The Court finds that a fair and reasonable amount for Plaintiff's past subjective losses is One Hundred Fifty Thousand and 00/100 Dollars ($150,-000.00), and that the value of her future reasonably probable subjective losses, to occur over her lifetime, equal an additional Fifty Thousand and 00/100 Dollars ($50,-000.00).

20. Therefore, the Court finds that the total of Plaintiff's past economic losses, future economic losses, past uncontroverted medical expenses, future reasonably probable medical expenses, and past and reasonably probable future subjective losses equals a total of Six Hundred Three Thousand Nine Hundred Eighty-two and 00/100 Dollars ($603,982.00). Deducting ten percent (10%) of this total, for Plaintiff's contributory negligence, the Court finds and awards net damages of Five Hundred Forty-three Thousand Five Hundred Eighty-three and eighty/100 Dollars ($543,583.80).

21. Additionally, the Court finds that Plaintiff is entitled to pre-judgment interest at the rate of four percent (4%) per annum, together with three percent (3%) future interest until time of payment in full of this Judgment, together with all properly taxable costs of court.

### III.

### CONCLUSIONS OF LAW

1. The Court concludes this is a case of admiralty and maritime jurisdiction, properly tried before the Court without benefit of a jury. 46 U.S.C.App. § 688, FED. R. CIV. P. 9(h). Venue and jurisdiction are proper. 28 U.S.C. § 1333.

2. At the time of her injury on or about June 18, 1998, the Court concludes Plaintiff ANTOINETTE HARRISON was a "seaperson" as that term is legally defined under the Jones Act, and was employed by Defendant SEA RIVER MARITIME, INC.

3. The Court concludes that the injuries and consequent damages proximately sustained by Plaintiff Harrison were proximately caused by ten percent (10%) her own negligence, in failing to act as a reasonably prudent Maintenance Sea under like circumstances, and ninety percent (90%) by Defendant, SEA RIVER MARITIME, INC., in negligently failing to act as a reasonable maritime employer under like circumstances.

4. The Court concludes that the vessel was in all respects seaworthy, and the Court assesses no damages predicated upon any theory of unseaworthiness. Any of Plaintiff's claims predicated upon that doctrine are **DISMISSED WITH PREJUDICE.**

5. The Court concludes that Plaintiff is not entitled to any further maintenance and only that cure set out *supra*. Plaintiff's claim for any past or future maintenance are **DISMISSED WITH PREJUDICE.**

6. The Court concludes that Plaintiff has proximately sustained net damages of Five Hundred Forty-three Thousand Five Hundred Eighty-three and eighty/100 Dollars ($543,583.80) as a direct and foreseeable result of Defendant's ascribed negligence. In addition, Plaintiff is awarded pre-judgment interest through the date of

this Judgment, at the rate of four percent (4%) per annum, and Plaintiff is further awarded post-judgment interest until this Judgment is fully satisfied, in the amount of three percent (3%) per annum.

7. To the extent that any foregoing Finding of Fact constitutes a Conclusion of Law, it is adopted as such. To the extent that any foregoing Conclusion of Law constitutes a Finding of Fact, it is adopted as such.

**IT IS SO ORDERED.**